**FILED**
**Jan 11, 2019**
**02:44 PM(CT)**
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT JACKSON

| | | |
|---|---|---|
| **SHARON SPRAGGINS,** | ) | **Docket No. 2018-07-0133** |
| **Employee,** | ) | |
| **v.** | ) | |
| **DELTA FAUCET,** | ) | **State File No. 52117-2017** |
| **Employer,** | ) | |
| **and** | ) | |
| **MASCO CORPORATION,** | ) | **Judge Amber E. Luttrell** |
| **Carrier.** | ) | |

## COMPENSATION HEARING ORDER

This matter came before the Court on December 6, 2018, for a Compensation Hearing. The legal issues are: (1) whether Ms. Spraggins suffered a compensable carpal tunnel syndrome injury arising primarily out of her employment; and (2) if so, whether she is entitled to past medical expenses, temporary disability benefits, and permanent partial disability benefits. For the reasons below, the Court holds Ms. Spraggins established a compensable injury by a preponderance of the evidence and sustained a permanent partial disability of two percent to the body as a whole. In addition Ms. Spraggins is entitled to past and future medical benefits and unpaid temporary total disability benefits.

### History of Claim

Ms. Spraggins works for Delta Faucet as an assembler. On July 11, 2017, she reported a gradually occurring injury to her right arm from assembling bathroom faucets on line 32 in the DST department. Before starting on line 32, Ms. Spraggins worked as a floater in the monitor assembly department, which she performed without difficulty for four years.

Ms. Spraggins testified that in May 2017, she voluntarily transferred from the monitor assembly department to the DST department to cross-train for additional experience and greater job security. She described the DST department as more repetitive and difficult than monitor assembly. She stated she trained on line 22 assembling kitchen faucets for four weeks. She worked eight- to nine-hour shifts and rotated positions every

1

thirty minutes. In June, Ms. Spraggins graduated from the training line and began work on line 32 assembling various models of bathroom faucets. She started experiencing problems in her right hand consisting of pain, swelling, tingling, and inability to sleep. Ms. Spraggins encountered the most difficulty working at station one, which required her to place a silver bullet on the end of a piece of conduit and manually force it through the faucet to the other end. She also described some difficulty in other stations manually "starting screws" before she would drill them in the rest of the way. She assumed she just needed to adjust to the position and attempted to cope with the symptoms but was eventually unable to do so and reported her injury on July 11.

Two days later, Ms. Spraggins completed an accident report. She noted gradually worsening pain from "pushing in on the faucet." (Ex. 4.) Delta Faucet provided a panel of physicians, and Ms. Spraggins chose Physician's Quality Care.

*Treatment*

According the medical records, Ms. Spraggins saw Dr. Peter Gardner at Physician's Quality Care three times in July. She reported pain and swelling in her right hand, which she associated with applying too much force when assembling faucets at work. On exam, Dr. Gardner noted moderate right hand swelling and pain with excessive gripping. He diagnosed a "strain of unspecified muscle, fascia, and tendon and wrist and hand level" following a work accident. Throughout treatment, he prescribed medication, assigned light-duty work restrictions, and ordered physical therapy for her noted work injury. In response to a causation letter from a claims adjuster, Dr. Gardner circled "no" when asked if Ms. Spraggins' need for treatment arose primarily out of and in the course and scope of her employment. Delta Faucet later denied the claim, and she sought continued treatment from unauthorized providers.

Ms. Spraggins next saw her primary care physician, Dr. Beryl Yancy, for her complaints. Dr. Yancy ordered an EMG/nerve conduction study, which indicated moderate carpal tunnel syndrome. She assigned light-duty work restrictions and referred Ms. Spraggins to an orthopedic specialist. Based on Dr. Yancey's referral, Ms. Spraggins visited Drs. John Arnold and James Calendruccio, both orthopedists, but was ultimately referred to Dr. Michael Dolan, an orthopedic hand specialist.[1]

On December 18, Ms. Spraggins saw Dr. Dolan and reported right hand pain, numbness, tingling, and "night-waking." Dr. Dolan found she had a very positive Tinel's sign and allodynia to light touch in her median nerve distribution. He diagnosed right carpal tunnel syndrome with allodynia and recommended surgery the same day. Ms. Spraggins agreed and underwent carpal tunnel release surgery.

---

[1] The records indicated that before seeing Dr. Dolan, Ms. Spraggins saw another physician Dr. Michael Cobb in the same practice and reported a consistent history of pushing conduits into faucets.

2

Following surgery, Ms. Spraggins returned to Dr. Dolan's office for follow-up treatment with Drew Freeman, FNP. He took her off work or assigned restrictions, which Delta Faucet did not accommodate. Therefore, Ms. Spraggins drew short-term disability benefits while off work. On February 23, 2018, Ms. Spraggins indicated she was ready to return to work, and FNP Freeman released her p.r.n. to full-duty work. Ms. Spraggins returned to Delta Faucet on February 27, and submitted several requests for a transfer, but Delta Faucet denied her requests and returned her to line 32.

Almost one month following her return to work, Ms. Spraggins returned to FNP Freeman and reported that her pain had returned. He referred her to a pain specialist in his office, but she was unable to treat with him for financial reasons.

Ms. Spraggins later sought an independent medical evaluation with Dr. Samuel Chung. The parties took the depositions of Dr. Dolan and Dr. Chung and introduced the following testimony.

*Physicians' Testimony*

### a. Dr. Dolan[2]

Dr. Dolan testified regarding his December 18 visit with Ms. Spraggins where he diagnosed carpal tunnel syndrome with allodynia and performed a surgical release. He stated, "She was so miserable that I released her the same day just to get her some relief, and she got better." He also summarized her follow-up treatment with FNP Freeman, stated her recovery was longer than normal because of her allodynia, and confirmed Ms. Spraggins was not treated under workers' compensation.

Regarding causation, Dr. Dolan testified based on his expert opinion, but he did not state his opinion was made within a reasonable degree of medical certainty. Delta Faucet's counsel asked Dr. Dolan to assume that Ms. Spraggins first reported her problems on July 11 and associated her symptoms with her work on line 32. Counsel further asked Dr. Dolan to assume that Ms. Spraggins did not start her job on line 32 until July 11, and he asked if her work on line 32 for one day primarily caused her carpal tunnel condition. Dr. Dolan responded no.

Dr. Dolan could not say whether Ms. Spraggins' carpal tunnel syndrome was acute or gradually occurring. He stated, "I don't know that it's either of those. I don't think we really know what causes carpal tunnel." He explained it used to be a medical fact that repetitive trauma caused carpal tunnel syndrome; however, he stated more recent data indicated it is from underlying conditions. Dr. Dolan agreed Ms. Spraggins did not have comorbidities for carpal tunnel such as diabetes, rheumatoid arthritis, thyroid problems, or pregnancy. Dr. Dolan acknowledged "her work is part of the story," but could not say

---

[2] Dr. Dolan is a board-certified orthopedic surgeon who specializes in hand and wrist surgery.

it was the primary cause. He said work brings on the symptoms but is not the cause. He further concluded repetitive trauma does not exist. He attributed her carpal tunnel syndrome to morbid obesity. However, neither Dr. Dolan's note or operative report, nor the records of FNP Freeman mentioned obesity or Ms. Spraggins' height, weight, or BMI.

On cross-examination, Dr. Dolan testified Ms. Spraggins was very honest with him. He agreed that she was asymptomatic before her work at Delta Faucet and that after surgery, her symptoms of numbness and tingling improved. He stated that it would not matter how long she worked or what she did at Delta Faucet because he would never conclude that her work primarily caused her carpal tunnel syndrome.

Regarding impairment, Dr. Dolan disputed the accuracy of Dr. Chung's use of the AMA Guides Table 15-21 for peripheral neuropathy for rating carpal tunnel syndrome. He testified that Table 15-23 (page 449) for entrapment/compression neuropathy impairment is the correct table for rating carpal tunnel syndrome. Dr. Dolan explained that carpal tunnel is different than a peripheral nerve injury. He stated, "if you cut your median nerve in half, your recovery is not the same as if your nerve is compressed in your carpal tunnel. Even though they are both median neuropathy, they are absolutely not the same." Had he found Ms. Spraggins' carpal tunnel to have primarily arisen from the work, he would have used Table 15-23, the carpal tunnel table, and assigned a two-percent impairment to the body using a Grade 1 modifier for conduction delay and based on intermittent symptoms with a normal exam.

Finally, Dr. Dolan testified that his office's treatment was reasonable and necessary for Ms. Spraggins' carpal tunnel syndrome, and his bills and those of Jackson Madison County General Hospital, attached as exhibits to his deposition, are consistent with the charges of other surgeons in this area.

### b. Dr. Chung[3]

Dr. Chung performed an independent medical evaluation in June 2018. Before seeing her, he reviewed her complete treatment records from Drs. Gardner, Yancy, Arnold, Calandruccio, Cobb, Dolan, and FNP Freeman. Dr. Chung took a history from Ms. Spraggins of her job tasks repetitively using her hands to manipulate and adjust parts while assembling parts at Delta Faucet. She described significant physical stress in her wrists and hands assembling the parts. Dr. Chung testified she began to experience significant pain and swelling in her right hand and wrist performing the work and reported it on July 11.

---

[3] Dr. Chung is board-certified in physical medicine and rehabilitation and in independent medical evaluations.

4

Dr. Chung summarized Ms. Spraggins' extensive treatment and testified that after recovery from surgery, she still has some numbness, pain, hand weakness, and loss of ability to manipulate her hand. She reported difficulty doing her job because of pain and decreased overall hand function.

Dr. Chung testified that Ms. Spraggins had no comorbidities for carpal tunnel. He also saw no evidence of direct trauma or fractures to her wrist that might cause carpal tunnel. On exam, Dr. Chung found a decrease in monofilament testing in the right median nerve distribution, which indicated sensation loss. She measured four out of five grip strength.

Regarding causation, Dr. Chung testified within a reasonable degree of medical certainty that, after considering all causes, Ms. Spraggins' work activities of gripping, prying, and adjusting parts were the primary cause of her carpal tunnel syndrome. He further stated her work injury caused greater than fifty percent of her condition.

Regarding impairment, Dr. Chung used Table 15-21 of the AMA Guides, Sixth Edition, for peripheral neuropathy impairment to calculate Ms. Spraggins' rating. After applying the grade modifiers, he assigned eight-percent impairment to the right upper extremity, which converted to a five-percent anatomic rating to the body as a whole. Dr. Chung acknowledged he did not use Table 15-23 in the Guides designated for entrapment neuropathies like carpal tunnel injuries. He explained the median nerve is a peripheral nerve and stated the peripheral nerve section was adequate to assign impairment for her injury. In explaining his method, Dr. Chung referenced Example 15-16 in the Guides, where the authors used the peripheral neuropathy table for an axillary nerve injury. He testified he disagreed with the authors of the Guides for providing a separate rating process for carpal tunnel rather than using the more general peripheral neuropathy section for all peripheral nerve injuries.

Dr. Chung acknowledged that, to assign the same rating using Table 15-23 for compression/entrapment neuropathy, Ms. Spraggins would have required severe atrophy or weakness, axon loss, and constant numbness. Dr. Chung agreed that she did not have those findings.

*Additional hearing testimony*

Ms. Spraggins testified she continues to work on line 32 with ongoing symptoms of swelling, pain, cramping, and loss of grip. She stated her line leader knows she has difficulty performing the job, and coworkers fill in for her on station one because of her problems. After work, Ms. Spraggins ices her hand and sleeps in a brace. She experiences some relief when she is off work on weekends.[4]

---

[4] The parties agreed Ms. Spraggins' treating physicians took her off work or assigned restrictions that Delta Faucet did not accommodate from September 7, 2017, through February 26, 2018, a total of twenty-

Delta Faucet disputed both medical causation and the timeline surrounding Ms. Spraggins' transition to line 32. To rebut her testimony, Delta Faucet offered the testimony of David Pearcy, the EHS and safety manager. While she maintained she trained on line 22 in May 2017 and started working on line 32 in June, Mr. Pearcy testified Ms. Spraggins first shadowed a coworker on line 32 on July 5 or July 7 and did not start working line 32 until July 11, the same day she reported her injury. However, he had no documentation that indicated she started on July 11; he stated it was based on his review of clock codes and talking to supervisors. On cross-examination, Mr. Pearcy acknowledged that Ms. Spraggins indicated on the July 13 accident report that her symptoms worsened gradually, and he agreed that would not make sense if her symptoms first started on July 11. Mr. Pearcy further acknowledged that Ms. Spraggins trained on line 22 in DST in May, and he conceded he did not know what she did in June.

On rebuttal, Ms. Spraggins testified she was certain that she trained in May, started line 32 in June, and she coped with her symptoms until she reported the injury on July 11.

Regarding the nature of the work, Mr. Pearcy testified the monitor assembly department consists mainly of packing boxes, whereas DST involves fully assembling faucets. Finally, Mr. Pearcy testified Dr. Chung's description of Ms. Spraggins' duties was consistent with the DST department.

**Findings of Fact and Conclusions of Law**

At a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that she is entitled to the requested benefits. *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2018).

*Compensability*

To be compensable, Ms. Spraggins must show her alleged injury arose primarily out of and in the course and scope of her employment and was caused by an incident, or specific set of incidents, identifiable by time and place of occurrence. Further, she must show, "to a reasonable degree of medical certainty that [her alleged work injury] contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." The term "reasonable degree of medical certainty" means that "in the opinion of the physician, it is more likely than not

---

four weeks and four days. She returned to work on February 27, 2018. Should the Court award temporary total disability benefits, the parties agreed Ms. Spraggins drew short-term disability benefits in the total amount of $6,263.57 through Delta Faucet's fully-funded disability plan for which it is entitled to an offset. Ms. Spraggins argued she is entitled to temporary total disability benefits totaling $13,096.82 minus a short-term disability credit of $6,263.57, for a balance of $6,833.25.

6

considering all causes, as opposed to speculation or possibility." *See generally* Tenn. Code Ann. § 50-6-102(14). Thus, causation must be established by expert medical proof.

The threshold question is whether Ms. Spraggins established by a preponderance of the evidence a specific incident or set of incidents to her right hand/wrist, identifiable by time and place of occurrence. The Court finds she did. Based on its direct observation of her, the Court finds Ms. Spraggins was steady, forthcoming, and honest in her testimony regarding the timeline of her job duties, symptoms, and condition and finds her extremely credible. *Kelly v. Kelly*, 445 S.W.3d 685, 694-695 (Tenn. 2014). She testified she transferred to the DST department in May 2017 and trained on line 22. After four-weeks of training, she graduated to line 32 in June making bathroom faucets and began experiencing pain, swelling, tingling, and inability to sleep. She specifically testified to difficulty forcefully pushing conduit through the faucets on station one. She attempted to cope with her symptoms and adjust to her new position, but was unable to do so and reported her injury on July 11.

Delta Faucet attempted to rebut her testimony with that of Mr. Pearcy, who stated she did not begin work on line 32 until July 11. However, Mr. Pearcy's explanation of how he determined this information was somewhat vague, and he had no documentation to support a July 11 start date. Mr. Pearcy did not know where she worked during the month of June, and he admitted the accident report indicated she reported the injury on July 11, but it had been gradually worsening over time. Mr. Pearcy acknowledged Ms. Spraggins never stated that her symptoms first began on July 11. Thus, the Court is not persuaded by his testimony and holds Ms. Spraggins proved a specific set of incidents to her right hand and wrist working on line 32.

The Court now turns to whether Ms. Spraggins established her condition and need for treatment arose primarily out of her employment. To resolve this dispute, the Court must consider the competing expert opinions in addition to the lay proof.

In analyzing the opinions of the physicians, the Court notes Dr. Dolan was not a panel-selected treating physician; thus, his opinion is not entitled to a statutory presumption of correctness. *See* Tenn. Code Ann. § 50-6-102(14)(E). A trial court has the discretion to choose which expert to accredit when there is a conflict of expert opinions and no statutory presumption exists. *Brees v. Escape Day Spa & Salon*, 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Mar. 12, 2015). In evaluating conflicting expert testimony, a trial court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Id.*

Applying the first factor, the Court notes both are experienced physicians. Dr. Dolan is a board-certified orthopedic hand surgeon; Dr. Chung is board-certified in physical medicine and rehabilitation as well as in independent medical evaluations. The

Court finds that both doctors are well qualified, and the differences in their qualifications are not determinative. The Court further notes that both physicians only saw Ms. Spraggins once.

The Court turns to the doctors' testimony regarding their causation opinions.

Considering Dr. Dolan's testimony, Delta Faucet asked him to assume Ms. Spraggins started work on line 32 and reported an injury on the same date, July 11. This is factually inaccurate based on this Court's above findings. Therefore, his opinion that her work for one day did not primarily cause her carpal tunnel was unfounded. Nevertheless, Dr. Dolan went on to testify it would not matter how long Ms. Spraggins worked for Delta Faucet or what she did. He would never conclude that her carpal tunnel was primarily caused by her work.

Dr. Dolan believed Ms. Spraggins was honest and had no symptoms before her work at Delta Faucet. He emphasized, "Her work is part of the story," and "work brings on the symptoms, but is not the cause." Instead, Dr. Dolan testified the cause of Ms. Spraggins' carpal tunnel syndrome was morbid obesity. The Court finds this testimony troubling because it appears unsupported by his own records. Notably, Dr. Dolan only saw Ms. Spraggins once, and there is no mention of morbid obesity or even her height, weight, or BMI in his December 18 record, operative report, and FNP Freeman's records. Moreover, no other physicians attributed Ms. Spraggins' condition to obesity. Lastly, Dr. Dolan did not testify that his causation opinion was within a reasonable degree of medical certainty.

In contrast, Dr. Chung testified within a reasonable degree of medical certainty that, after considering all causes, Ms. Spraggins' work activities she described to him assembling faucets were the primary cause of her carpal tunnel syndrome and need for treatment. He further stated her injury caused greater than fifty percent of her carpal tunnel condition. It appears to the Court that Dr. Chung, unlike Dr. Dolan, reviewed Ms. Spraggins' complete treatment records from all providers, which contained her history of the specific problems she encountered working on line 32. Moreover, Mr. Pearcy confirmed in his testimony that the work activities Dr. Chung testified Ms. Spraggins performed were consistent with her job in the DST department. Dr. Chung determined Ms. Spraggins had no comorbidities for carpal tunnel syndrome, and he did not testify to or note in his record any finding of obesity.

Significantly, Tennessee law has long held that medical proof is not to be "read and evaluated in a vacuum" but, instead "must be considered in conjunction with the lay testimony of the employee as to how the injury occurred and the employee's subsequent condition." *Thomas v. Aetna Life and Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991).

Here, based on Ms. Spraggins' credible testimony combined with the totality of

8

the medical proof, the Court finds Dr. Chung offered the more probable and persuasive explanation and holds Ms. Spraggins' carpal tunnel syndrome and her need for treatment arose primarily out of her employment.

*Extent of disability*

Having found Ms. Spraggins sustained a compensable injury, the Court turns to the extent of her permanent partial disability and considers the competing impairment opinions.

Dr. Dolan testified Table 15-23 (p. 449) of the Guides for entrapment/compression neuropathy impairment is the correct table to rate carpal tunnel injuries and assigned a two-percent impairment to the body based on that table. Dr. Chung disagreed and used Table 15-21 (p. 438) for peripheral neuropathy, and he assigned a five-percent impairment to the body.

On this point, the Court finds Dr. Dolan's testimony more persuasive. He testified that carpal tunnel syndrome is different from a peripheral nerve injury. He stated, "if you cut your median nerve in half, your recovery is not the same as if your nerve is compressed in your carpal tunnel. Even though they are both median nerve neuropathy, they are absolutely not the same." Moreover, the authors of the Guides specifically included a separate section to rate entrapment/compression neuropathies. In Table 15-21, used by Dr. Chung, the authors explicitly direct physicians to the entrapment/compression neuropathy table for rating carpal tunnel syndrome. In sum, upon consideration of the preponderance of the evidence, the Court holds Dr. Dolan's impairment opinion is the accurate rating and sets the anatomic rating at two-percent to the whole person. Accordingly, Ms. Spraggins is entitled to permanent partial disability of nine weeks at her stipulated compensation rate of $533.01, for a total of $4,797.09.

The Court further holds Ms. Spraggins established she is entitled to temporary total disability benefits for the time her treating physicians took her off work or assigned light-duty restrictions that Delta Faucet did not accommodate from September 7, 2017, through February 26, 2018, a total of twenty-four weeks and four days. At her compensation rate of $533.01, she is entitled to $13,096.82 in temporary total disability benefits. By stipulation, Delta Faucet is entitled to an offset in the amount of $6,263.57 for the short-term disability benefits paid to Ms. Spraggins, leaving her a balance of $6,833.25.

*Medical benefits*

Finally, the Court holds Ms. Spraggins established by a preponderance of the evidence that her medical bills incurred for treatment of her carpal tunnel syndrome were reasonable and necessary for her work injury. Thus, Delta Faucet shall satisfy Ms. Spraggins' medical bills owed to Dr. Dolan's office and Jackson Madison County

General Hospital. *See* Tennessee Code Annotated section 50-6-204. Finally, the Court holds Ms. Spraggins is entitled to reasonably necessary future medical treatment under Tennessee Code Annotated section 50-6-204 with an orthopedic specialist selected from a panel of physicians.

**IT IS, THEREFORE, ORDERED** as follows:

1. Delta Faucet shall pay permanent partial disability benefits of $4,797.09.

2. Delta Faucet shall pay temporary total disability benefits of $6,833.25.

3. Delta Faucet shall satisfy Ms. Spraggins' medical bills owed to Dr. Dolan's office and Jackson Madison County General Hospital under Tennessee Code Annotated section 50-6-204.

4. Delta Faucet shall provide future medical benefits under Tennessee Code Annotated section 50-6-204. It shall provide Ms. Spraggins a panel of orthopedic specialists from which she may select her treating physician unless she elects to continue treatment with Dr. Dolan.

5. Ms. Spraggins' attorney is entitled to a twenty-percent fee of the total award under Tennessee Code Annotated section 50-6-226(a)(1). He may submit a motion for discretionary costs, unless the parties reach an agreement on this issue.

6. Delta Faucet shall pay $150.00 costs to the Court Clerk within five business days under Tennessee Compilation Rules and Regulations 0800-02-21-.07. It shall also file a Form SD-2 within ten business days of this order becoming final.

7. Absent an appeal of this order, it shall become final thirty days after issuance.

**ENTERED January 11, 2019.**

_____
**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

10

APPENDIX

Stipulated Findings of Fact:5
1. Ms. Spraggins reached maximum medical improvement on February 23, 2018.
2. Ms. Spraggins returned to Delta Faucet earning the same or greater rate of pay.
3. Ms. Spraggins' compensation rate is $533.01.

Exhibits:
1. Dr. Dolan's deposition (with exhibits)
2. Dr. Chung's deposition (with exhibits)
3. Group disability claim and payment information
4. Delta Faucet Report of Injury or Illness

Technical record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Scheduling Hearing
4. Scheduling Order
5. Dispute Certification Notice (post-discovery)
6. Employee's List of Witnesses and Exhibits
7. Pre-Compensation Hearing Statement

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Order was sent to the following recipients by the following methods of service on January 11, 2019.

| Name | Via Email | Service sent to: |
|---|---|---|
| Edward L. Martindale, Jr., Employee's Counsel | X | edwardlmartindale@gmail.com rachalmwallace@gmail.com |
| Hailey David, Employer's Counsel | X | davidh@waldrophall.com smithj@waldrophall.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

---

5 For brevity, the Court only listed those stipulated facts relevant to the Court's holding. The complete stipulated findings of fact are contained in the Pre-Compensation Hearing Statement included in the Technical Record as Ex. 7.

11